IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Altravise Hunt-Allen, | ) | C/A No.: 0:12-127-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Branch Banking & Trust Company of | ) | |
| South Carolina, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this employment discrimination case, Altravise Hunt-Allen ("Plaintiff") is suing Branch Banking & Trust Company of South Carolina ("Defendant" or "BB&T"). Plaintiff alleges the following causes of action: (1) race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. § 1981; (2) retaliation in violation of Title VII; and (3) wrongful conversion.

This matter comes before the court on Defendant's motion for summary judgment filed on September 18, 2012. [Entry #23]. The motion for summary judgment having been fully briefed [Entry #26, #29], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district court grant Defendant's motion.

I.      Factual and Procedural Background

Defendant hired Plaintiff in January 2006 as a Relationship Banker Trainee at its main branch ("Rock Hill branch") on South Herlong Avenue in Rock Hill, South Carolina. [Entry #23-29 at ¶ 3]. Plaintiff was promoted to Relationship Banker I in July 2006 and to Relationship Banker II in July 2008. *Id.*

Relationship Bankers are the primary-level customer contact in each branch and are generally responsible for initiating, developing, and managing customer relationships as well as providing excellent customer service. *Id.* As a Relationship Banker, Plaintiff was expected to maintain a close working relationship with Integrated Relationship Management ("IRM") partners and to refer clients, as appropriate. [Entry #23-24 at ¶ 4; Entry #23-29 at ¶ 6]. IRM partners are employees of BB&T subsidiaries and affiliates who handle other aspects of a customer's financial relationship with BB&T, such as mortgages, insurance, and wealth management. *Id.* Just as Plaintiff was expected to refer clients to the IRM partners in her branch, there was an expectation that the IRM partners would refer clients to the Relationship Bankers. [Entry #26-4 at ¶ 4]. The more referrals Plaintiff received from the IRM partners, the more income Plaintiff would earn. *Id.*

On August 18, 2008, one month after Plaintiff's promotion to Relationship Banker II, two regional BB&T auditors conducted a routine operational audit at the Rock Hill branch. Pl. Dep. 62:10–23 [Plaintiff's deposition is docketed as Entry #26-2]. In Plaintiff's desk, the auditors found a stack of important time-sensitive bank documents dating as far back as 2006, when Plaintiff began her employment with BB&T. Pl. Dep. 62:24–65:13. Among the old, unattended documents were 95 incomplete signature cards,

70 signature cards that had been signed by clients but never turned in, interoffice mail envelopes containing mail that had not been opened, bank account statements for many clients, and copies of Social Security cards and drivers' licenses for customers and other employees. Pl. Dep. 63:22–64:4. The auditors immediately reported this discovery to branch Manager, Eric Bowers, and to other BB&T managers. [Entry #23-6].

On August 26, 2008, Mr. Bowers issued Plaintiff a Final Written Warning for her failure to appropriately process time-sensitive bank documents. *Id*. In addition to describing the deficiencies in Plaintiff's performance, the Final Written Warning outlined ways she could improve her organization, productivity, and efficiency in fulfilling her duties as a Relationship Banker. *Id*. Plaintiff was expressly warned that her continued failure to keep bank matters organized and up-to-date would result in disciplinary action, up to and including termination. *Id*.

In 2009, Melissa Schmidt was hired as a Relationship Banker for the Rock Hill branch. On August 5, 2009, while meeting with Mr. Bowers to review her 2009 mid-year performance evaluation, Plaintiff complained that the IRM partners were sending more referrals to Ms. Schmidt than to Plaintiff because Ms. Schmidt is white and Plaintiff is African-American. Pl. Dep. 73:15–74:20. Mr. Bowers told Plaintiff that he would investigate. Pl. Dep. 82:7–83:14.

Mr. Bowers reported Plaintiff's complaint to his superior, Elizabeth Kakacek, and they sought guidance from Sherri Harper, their Regional Employee Relations Manager. [Entry #23-24 at ¶¶ 4–6; Entry #23-29 at ¶¶ 7–9]. Ms. Harper instructed Mr. Bowers and Ms. Kakacek to confidentially interview other employees of the branch, determine

whether they believed discriminatory treatment was taking place, and discuss the outcome of the investigation with Plaintiff. *Id*. The next day, August 6, 2009, Mr. Bowers interviewed other branch employees. *Id*. The IRM partners were also interviewed. *Id*. Mr. Bowers and Ms. Kakacek then met with Plaintiff and shared the results of the investigation with her. Pl. Dep. 83:9–18; 86:18–87:4. They reported to Plaintiff that while some employees believed Ms. Schmidt received more IRM referrals, no employees believed race discrimination was involved. *Id*. Instead, the employees believed IRM partners sent more referrals to Ms. Schmidt because she was quicker, more organized, and more accurate than Plaintiff. *Id*.; Entry #23-27 at ¶¶ 3–7; Entry #23-28 at ¶ 3. Based on the investigation, Mr. Bowers and Ms. Kakacek encouraged Plaintiff to work on communicating more effectively with IRM partners to try to build a trusting relationship in an effort to obtain more referrals. Pl. Dep. 87:14–88:3; 89:13–90:12.

After meeting with Mr. Bowers and Ms. Kakacek, Plaintiff contacted Regional Banking Manager John Cole. Pl. Dep. 92:16–95:25. Mr. Cole reiterated to Plaintiff that the interviews with the IRM partners conveyed their observations and concerns that Plaintiff's effectiveness in handling the needs of Defendant's customers was not as strong as Ms. Schmidt's and that any inequity in the number of referrals was performance-related and had nothing to do with Plaintiff's race. *Id*.

In the beginning of 2010, Benjamin Lee became the new Branch Manager at the Rock Hill branch. [Entry #26-1 at ¶ 10]. Throughout the first several months of Mr. Lee's tenure as manager, he was in and out of the office undergoing management training. [Entry #26-3 at 10].  Mr. Lee's training was completed in May 2010. *Id*.

In a meeting with Mr. Lee on May 5, 2010, Plaintiff expressed her concerns that Ms. Schmidt was receiving more referrals, although she acknowledged that it was based on the IRM partners' perception that Ms. Schmidt did a better job. Pl. Dep. 100:10–101:3. During this meeting, Mr. Lee told her that he was aware of her prior complaints about referrals, but Plaintiff did not reiterate her claims of discrimination. Pl. Dep. 104:19–106:7. At the conclusion of the meeting, Mr. Lee gave Plaintiff five specific recommendations and expectations to improve her productivity and reputation at BB&T. Pl. Dep. 101:4–102:21. Specifically, Mr. Lee recommended that Plaintiff immediately update BB&T's customer management system following customer interactions, focus on following-through and timely completing tasks, cross-sell and initiate sales of BB&T products with the internal resources available to her, and pursue opportunities to enhance her relationships with IRM partners. [Entry #23-10].

On August 6, 2010, Mr. Lee and Ms. Kakacek met with Plaintiff and provided her with her second Final Written Warning. [Entry #23-11]. The second Final Written Warning documented five instances in which Plaintiff failed to follow through with a responsibility to a customer, resulting in lost time by Plaintiff's co-workers, negative customer experiences, and lost business. *Id*. The service deficiencies included a situation in which Plaintiff failed to promptly enter her interactions with a client in BB&T's client management system, resulting in Ms. Schmidt contacting the client for the same service, and then Plaintiff admittedly backdating her entry to try to receive credit for a loan to the client. *Id*. Another service break involved an incident in which Plaintiff failed to transfer funds to a newly-opened account as she agreed to do for a customer, causing the

5

customer's business-related checks to bounce. *Id*. In addition to documenting service deficiencies, the second Final Written Warning referenced repeated occasions, including Plaintiff's first Final Written Warning, performance evaluations, and one-on-one coaching sessions, in which she had been counseled on similar performance issues. *Id*. The warning reminded Plaintiff of specific ways she could improve, including documenting client interactions as soon as they occur, promptly responding to emails, and following up with customers. *Id*. The warning stated that "[i]t is the immediate expectation of BB&T that you improve your communication and follow-through with promises to BB&T employees and clients," and that failure to do so could result in termination. *Id*. As Ms. Kakacek documented on the last page of the second Final Written Warning, Plaintiff refused to sign it. *Id*.

On August 30, 2010, Plaintiff met with Regional Employee Relations Manager Sherri Harper. Pl. Dep. 118:4–120:16. Plaintiff complained to Ms. Harper that the second Final Written Warning was inaccurate. *Id*. Plaintiff told Ms. Harper, who is African-American, that she felt she was being treated unfairly, but did not say that she believed she was being discriminated against. *Id*.; Entry #23-29 at ¶ 10. According to her affidavit, after her meeting with Ms. Harper, Plaintiff notified Lynn Murray in Human Resources that she believed Mr. Lee was discriminating against her based on her race. [Entry #26-1 at ¶ 20]. Ultimately, Ms. Harper and Mr. Lee amended the second Final Written Warning to remove references to two of the five service breaks. Pl. Dep. 121:22–125:14. However, when Mr. Lee met with Plaintiff on October 22, 2010, to provide her with the

amended Final Written Warning, she again refused to sign it, based on further alleged

inaccuracies. *Id.*

BB&T management continued to receive complaints from bank customers,

employees, and IRM partners regarding Plaintiff's lack of organization, communication,

and customer responsiveness, including the following:

• In early August 2010, Plaintiff mistakenly told a customer she could not give him a rate quote on a real estate loan unless he furnished a sales contract. Plaintiff asked Mr. Lee to call the customer. The customer expressed to Mr. Lee he was so frustrated by the difficulty in getting a rate quote from Plaintiff that he had taken $312,000 in loan business to another bank. [Entry #23-13].

• On or about August 30, 2010, BB&T Area Operations Officer Cindy Bergeron spot-checked the offices of the Rock Hill branch's Relationship Bankers to confirm they were displaying the appropriate brochures for BB&T services. Ms. Schmidt's brochures were current and updated. Plaintiff's brochures had not been updated from the previous year, and she was displaying pricing guides, services agreements, FDIC information, and business account options that were no longer accurate. [Entry #23-14].

• On or about September 23, 2010, a long-time bank customer complained both to Ms. Schmidt and Mr. Lee that, on the customer's previous visit, Plaintiff had been rude to her and refused to fix an error in the customer's check order without imposing a fee. The customer further complained Plaintiff always took too long and made mistakes. The customer indicated she no longer wished to be helped by Plaintiff. [Entry #23-15]. Plaintiff does not recall speaking with the customer. Pl. Dep. 138:24–139:7.

• In September 2010, Mr. Lee was contacted by a Mortgage Loan Officer ("MLO") at a different BB&T branch who complained that Plaintiff referred two customers to another MLO after Ms. Schmidt had already referred those same customers to her for the exact same services. [Entry #23-18]; Pl. Dep. 150:18–154:17.

• On October 5, 2010, a customer complained to Mr. Lee that Plaintiff had not removed his deceased wife's name from his BB&T accounts, despite having presented the death certificate to Plaintiff a week and a half earlier when making that request. When the customer complained, Mr. Lee asked Ms. Schmidt to handle the matter. Bank records showed that Plaintiff never attempted to access the customer's account. [Entry #23-19]. Plaintiff does not recall helping this client. Pl. Dep. 155:1–157:11.

• On October 7, 2010, a customer complained to Mr. Bowers that she had come into the branch several weeks earlier and approached a Relationship Banker with questions about

her loan. The Relationship Banker told her she would call her the following day. The Relationship Banker never called her back. Mr. Lee investigated and determined that Plaintiff was the Relationship Banker responsible for this service break and that Plaintiff had made no account notes reflecting the customer's initial visit. [Entry #23-20]. Plaintiff does not recall helping this client. Pl. Dep. 157:19–160:15.

In late October 2010, based on Plaintiff's continuing service deficiencies and performance issues, Mr. Lee consulted with Ms. Harper about recommending that Plaintiff's employment be terminated. [Entry #23-29 at ¶¶ 12–13]. After reviewing Plaintiff's service deficiencies and warnings, Mr. Lee and Ms. Harper concluded Plaintiff's employment should be terminated. *Id*. Ms. Kakacek's superior, Mr. Wells, participated in and agreed with the decision to terminate, as Ms. Kakacek was on maternity leave at the time. *Id*. On November 1, 2010, Defendant terminated Plaintiff's employment. *Id*.

Immediately after Plaintiff was terminated by Mr. Lee, she went to her office to gather her personal items. Ms. Bergeron watched Plaintiff as she gathered her things. Pl. Dep. 205:20–210:8. Two of the items Plaintiff attempted to take with her were (1) a certificate acknowledging Plaintiff's certification as a Relationship Banker II, and (2) a plaque containing Plaintiff's name and job position. *Id*. As Plaintiff began placing her certificate and plaque into a box that she was using to gather her belongings, Ms. Bergeron told her that she could not take those items. *Id*. In a subsequent meeting, Ms. Harper told Plaintiff that Ms. Bergeron had made a mistake in telling Plaintiff to leave these items and told Plaintiff that she would try to get the items back if Plaintiff wished. Pl. Dep. 210:21–211:25.

II.    Discussion

A.    Standard on Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

B.    Analysis

1.    Racial Discrimination

In a Title VII claim, absent direct evidence of discrimination, as is the case here, Plaintiff must prove her allegations under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. Under *McDonnell Douglas*, Plaintiff first must establish by a preponderance of evidence each element of her prima facie case of discrimination. *Id.* at 802. To state a prima facie claim of race discrimination, Plaintiff must prove: (1) she is a member of a protected class; (2) she was performing satisfactorily; (3) she suffered an adverse employment action; and (4) similarly-situated employees received more favorable treatment. *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Where a plaintiff claims

discriminatory discharge, the fourth element has also been identified as whether plaintiff can demonstrate that the position was filled by a similarly-qualified applicant outside of the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. *Texas Dep't. of Cmty Affairs v. Burdine*, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143. Throughout the burden-shifting scheme set forth in *McDonnell-Douglas*, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally discriminated against her.

Defendant appears to concede the first and third elements of the prima facie case that Plaintiff is a member of a protected class and that she suffered an adverse employment action. The undersigned addresses the remaining elements of Plaintiff's prima facie case.

a.    Prima Facie Case

i.    Second Element

Defendant first argues that Plaintiff has failed to establish the second element of the prima facie case because she cannot establish that she was satisfactorily performing her job. The performance summaries of Plaintiff's evaluations typically fluctuated between a rating of "Growth Opportunity," indicating that "the individual performs in an acceptable way in many aspects, but has opportunity to grow in others" and "Performer," indicating "the individual consistently and reliably meets job expectations and requirements." [Entry #23-3, 23-4, 23-5]. Assuming arguendo that her performance evaluations are insufficient to show that Plaintiff's performance was inadequate, Defendant has shown that Plaintiff was cited for multiple service deficiencies as a Relationship Banker. She initially received a Final Written Warning in August 2008 after an audit revealed her failure to timely file numerous time-sensitive bank documents. [Entry #23-26]. Plaintiff received her Second Final Written Warning in August 2010 for various service deficiencies. [Entry #23-11]. Thereafter, Defendant became aware of at least five additional incidents of Plaintiff's deficient performance between August 2010 and October 2010.

Plaintiff claims that many of the cited service deficiencies contain misrepresentations and false accusations. In support, she relies on her own deposition testimony and her own affidavit in opposition to summary judgment. She takes issue with Mr. Lee's documentation of her deficiencies via emails to himself without advising her and claims that he was trying to create a paper trail against her. [Entry #26 at 6, 25]. The

11

Fourth Circuit has repeatedly explained that a plaintiff's perception of herself is not relevant. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). In considering whether a claimant was adequately performing her job, it is the perception of the decision maker which is relevant, not the self-assessment of the claimant. *Beall v. Abbott Labs*, 130 F.3d 614, 619 (4th Cir. 1997). Additionally, while Plaintiff may disagree as to whether she was at fault for the cited service deficiencies, she has not disputed that her supervisor believed her to be at fault for the deficiencies. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (holding on a motion for summary judgment that a Plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the Plaintiff] was meeting [the employer's] expectations"). Therefore, Plaintiff has failed to establish the second element of the prima facie case that she was performing satisfactorily at the time of her adverse employment action.

> ii.     Fourth Element

>> (a)     Treatment of Similarly-Situated Employees

Plaintiff argues that Defendant's IRM partners discriminated against her by giving Ms. Schmidt more client referrals. Plaintiff further argues that the disparate treatment on referrals caused her to lose income and her performance to appear less positive. [Entry #1].

When a plaintiff bases her discrimination claim on a similarly-situated comparator, it is the plaintiff's "task to demonstrate that the comparator is indeed similarly situated." *Haywood v. Locke*, 387 Fed. Appx. 355, 359 (4th Cir. 2010) (citing *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Plaintiff is required to

show that she is similar in all relevant respects to her comparator. *Haywood*, 387 Fed. Appx. at 359. "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id*. The task falls on Plaintiff to identify a suitable comparator, bearing in mind that "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Bradley v. S.C. Dep't. of Corr.*, C/A No. 3:08–2510–JFA, 2010 WL 883729 (D.S.C. March 5, 2010) (citing *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)).

Defendant argues that Plaintiff has failed to show that she and Ms. Schmidt were similarly-situated because Plaintiff's job performance was inferior to that of Ms. Schmidt. Specifically, Defendant notes that Plaintiff received a Final Written Warning in 2008, before Ms. Schmidt was a Relationship Banker. Additionally, when Plaintiff complained of racial discrimination in 2009, Plaintiff's co-workers and the IRM partners unequivocally stated that any disparity in referrals to Ms. Schmidt over Plaintiff resulted from Ms. Schmidt doing a better job, and they strongly denied any racially-discriminatory motivation. [Entry #23-27 at ¶¶ 3–7; Entry #23-28 at ¶ 3; Entry #23-24 at ¶¶ 6–8]. Specifically, IRM employees attested that Plaintiff often completed paperwork inaccurately, took longer to complete tasks, and demonstrated poor communication skills. *Id*. Therefore, the IRM employees tended to refer their clients to other Relationship Bankers. *Id*.

Because the evidence shows that Plaintiff was repeatedly cited for service deficiencies and there is no indication that Ms. Schmidt had the same or similar deficiencies, Plaintiff has not shown that she and Ms. Schmidt were similarly-situated such that the IRM partners' referral of more clients to Ms. Schmidt was discriminatory. Additionally, Plaintiff has not shown that Ms. Schmidt had been cited for numerous service deficiencies but was nevertheless retained. Therefore, Plaintiff has failed to show a similarly-situated comparator outside of her protected class was treated more favorably.

(b)    Replaced by a Person Inside Protected Class

According to Defendant, Plaintiff was replaced by Monique Buckson, an African-American female. [Entry #23-24 at ¶ 14]. Although Plaintiff claims that she was told by Ms. Buckson that a white male initially replaced Plaintiff, she provides no support for this hearsay evidence. [Entry #26-1 at ¶ 31]. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Therefore, Plaintiff has failed to set forth a suitable comparator for purposes of his prima facie case.

Because Plaintiff has failed to establish the second and fourth elements of her prima facie case of discrimination, the undersigned recommends the court grant Defendant's motion for summary judgment.

b.    Pretext Analysis

Even if Plaintiff were able to establish a prima facie case of discrimination, summary judgment is still appropriate because Defendant has proferred a legitimate, nondiscriminatory reason for terminating Plaintiff, and Plaintiff has failed to submit

evidence that the reason is merely pretext for discrimination. Defendant asserts that it terminated Plaintiff because she was a poor performer and had multiple service deficiencies. Plaintiff concedes that Defendant has set forth a legitimate, non-discriminatory reason for her termination. [Entry #26 at 24]. The burden, therefore, shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143.

"At this point, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (internal citations omitted). In order to satisfy this burden, it is not sufficient for Plaintiff to show merely that Defendant's asserted reason is false; rather, Plaintiff must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515–16. Here, the undersigned finds that Plaintiff has failed to identify a genuine dispute of material fact as to whether her termination was the result of intentional discrimination.

Plaintiff bases her pretext argument on evidence that she claims raises an inference of discrimination. Central to her argument is the assertion that Defendant's stated reason for terminating her is untrue. She argues that Mr. Lee's emails to himself documenting her service deficiencies show that he was building a paper trail to have her terminated. [Entry #26 at 25]. Employers frequently "build cases against" underperforming employees. Doing so does not demonstrate discrimination vel non. Plaintiff also claims

that the Second Final Written Warning contains false and misleading information from which it can be inferred that Mr. Lee was "inhibiting her from having the opportunity to improve," and that it can be inferred he harbored racial animus towards her. *Id.* This argument is without merit because Plaintiff's contention regarding the allegedly false and misleading write ups is based on her own self-serving testimony and must be disregarded for the reasons set forth in the discussion of the prima facie case alone. In addition, Plaintiff's argument impermissibly attempts to build one inference upon another. *See Beale v. Whitehead Bros. Co.*, 769 F.2d 213, 214 (4th Cir. 1985). A review of the record demonstrates that Plaintiff has not met her ultimate burden of showing that Defendant's true reason for terminating her was discriminatory. Therefore, summary judgment for Defendant is appropriate.

### 2. Retaliation

Title VII forbids employers from retaliating against their employees for exercising their rights under the statutes, which are considered "protected activities." 42 U.S.C. § 2000e–3(a); 29 U.S.C. § 623(d). "Protected activities fall into two distinct categories: participation or opposition . . . . An employer may not retaliate against an employee [for] participating in an ongoing investigation or proceeding . . . nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

To set forth a claim of retaliation pursuant to Title VII, Plaintiff must first establish a prima facie case by producing evidence that (1) she engaged in protected

activity; (2) an adverse employment action was taken against her; and (3) there was a causal link between the protected activity and the adverse action. *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006).

Plaintiff alleges that she engaged in protected activity by complaining of racial discrimination on the following occasions: (1) in August 2009, she reported to Mr. Bowers, and later to Mr. Cole, that she believed she was receiving fewer referrals from IRM partners than Ms. Schmidt because of her race; and (2) on August 6, 2010, she complained to Ms. Murray after receiving her second Final Written Warning. Defendant does not dispute that Plaintiff's termination constitutes an adverse employment action.

Defendant argues that Plaintiff has failed to show a causal link between the alleged protected activities and the adverse action. Plaintiff could establish causal connection through a showing of temporal proximity between her protected activity and termination. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). Although "very close" temporal proximity can, in some cases, be sufficient alone to establish causation, an extended period of time between protected activity and alleged retaliation "suggests, by itself, no causality at all." *Id.* The Fourth Circuit has held a time gap in excess of a year is too long to establish a causal connection. *See, e.g. Pascual v. Lowe's Home Centers, Inc.*, 2006 WL 2226571 at *4 (4th Cir. 2006) (affirming summary judgment when only evidence of causal connection was three to four month time gap); *Curry v. Guardian Indus. Corp.*, 2007 WL 172510 at *2 (D.S.C. January 18, 2007) (granting summary judgment when race-related complaints were made over a year before termination).

With regard to her August 2009 protected activity, Plaintiff claims that retaliatory animus can be shown despite the absence of temporal proximity based on Mr. Lee's documentation of her service deficiencies. Plaintiff again relies on her testimony that these deficiencies were either invalid or not her fault. Additionally, she argues that retaliatory animus can be shown based on Mr. Lee's failure to address all of the documented deficiencies with Plaintiff. [Entry #26 at 29–30]. Plaintiff essentially makes the same arguments to show retaliatory animus as to support her claim of racial animus. However, Plaintiff has set forth no specific or distinct evidence that her termination was in retaliation for her August 2009 protected activity. Additionally, even if Plaintiff could meet her prima facie case of retaliation, she is still unable to show that Defendant's reasons for terminating her were pretextual, as her failure to satisfactorily perform her job is well-documented. Therefore, Plaintiff cannot show that Defendant retaliated against her based on her August 2009 complaint of racial discrimination.

The temporal proximity between Plaintiff's August 6, 2010 complaint and her termination is also insufficient, standing alone, to establish a causal connection. *See, e.g.* *Pascual v. Lowe's Home Centers, Inc.*, 2006 WL 2226571 at *4. Plaintiff has submitted no other evidence to support her claim that she was terminated based on her August 6, 2010, complaint. In fact, Plaintiff's argument throughout her briefing is that Defendant had been building a paper trail to justify terminating her on other bases since her 2009 complaint. Plaintiff has failed to show a prima facie case of retaliation based on her August 6, 2010, complaint. Plaintiff is again unable to show that Defendant's reasons for terminating her were pretextual in light of the multiple documented service deficiencies.

Therefore, the undersigned recommends Defendant be granted summary judgment on Plaintiff's claim of retaliation.

### 3. Conversion

Plaintiff alleges Defendant converted two of her personal items, specifically a BB&T plaque and a framed BB&T certificate, by not allowing her to remove those items from her office following her termination. Conversion is the unauthorized assumption and exercise of rights of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the rights of the owner. *Green v. Waidner*, 324 S.E.2d 331, 333 (S.C. Ct. App. 1984).

Assuming, without deciding, that Plaintiff had the right of ownership of the plaque and certificate, Plaintiff may not prevail on her conversion claim because she did not make a demand for the items. *See, e.g. Causey v. Blanton*, 314 S.E.2d 346, 348 (S.C. Ct. App. 1984). Plaintiff testified that, following her termination, and as she was packing her personal belongings, Ms. Bergeron told her she could not keep the items because they had the BB&T logo and were BB&T property. Pl. Dep. 205:20–206:1. Plaintiff admitted she did not contest Ms. Bergeron's request, tell Ms. Bergeron she wanted to take the items, or explain to Ms. Bergeron that they had sentimental or other value for her. Pl. Dep. 209:22–210:8. Moreover, when Plaintiff met with Ms. Harper following her termination, Plaintiff did not demand that Ms. Harper try to find the plaque and certificate. Pl. Dep. 210:21–211:21. Therefore, the undersigned recommends Defendant be granted summary judgment on Plaintiff's conversion claim.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment [Entry #23] be granted.

IT IS SO RECOMMENDED.

June 18, 2013                                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).